IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**SELINA CRESPIN, on behalf of**
**JAMES R. CRESPIN,**

      **Plaintiff,**

vs.                                                                                          No.  05cv1149 DJS

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER

      This matter is before the Court on Plaintiff's (Crespin's) Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, to Remand for a Rehearing **[Doc. No. 12]**, filed February 28, 2006, and fully briefed on June 15, 2006.  On May 24, 2005, the Commissioner of Social Security issued a final decision denying Crespin's application for Supplemental Security Income payments on behalf of her son.  Crespin seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §405(g).  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds that the motion to remand for a rehearing is well taken and will be GRANTED.

### I.  Factual and Procedural Background

      On January 30, 2002, Crespin filed an application for Supplemental Security Income payments on behalf of her son, Jimmy, alleging disability due to attention deficit disorder, a learning disability, and bipolar disorder.  Crespin alleged Jimmy had been disabled since birth (April 16,1989) due to complications during the pregnancy and during the birth and low birth

weight, or since May 1, 1995.[1]  Tr. 48.  On January 5, 2005, the Administrative Law Judge (ALJ) held a hearing at which Crespin and Jimmy testified.  Tr. 359-374.  On May 24, 2005, the ALJ issued her decision, finding Jimmy's attention deficit hyperactivity disorder (ADHD), bipolar disorder and learning disorder were severe impairments but did not meet or medically or functionally equal the criteria for any impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  Tr. 14-23.  On September 15, 2005, the Appeals Council denied Crespin's request for review of the ALJ's decision.  Tr. 5-7.  Hence the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Crespin seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence,"

---

[1] The Commissioner correctly points out that the relevant time period under consideration began on January 24, 2002, the date Crespin protectively filed for benefits, and ended on May 24, 2005, the date of the ALJ's decision.  *See* 20 C.F.R. § 416.335 ("If [claimant] files an application [for SSI] after the month [claimant] first meet[s] all the other requirements for eligibility, [the agency] cannot pay [claimant] for the month in which [claimant's] application is filed or any months before that month.").

*Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

A child is considered disabled if he has a "medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §416.906. A sequential three-step process guides the Commissioner's determination of whether a child meets this criteria. The ALJ must determine (1) whether the child is engaged in substantial gainful activity, (2) whether the child has an impairment or combination of impairments that is or are severe, and (3) whether the child's impairment(s) meets or medically or functionally equals an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Pt. 404. *See* 20 C.F.R. § 416.924(a).

In this case, the ALJ found Jimmy was not engaged in substantial gainful activity and had severe impairments. At step three, the ALJ found Jimmy's impairments did not meet, medically

or functionally equal a Listing.  Specifically the ALJ analyzed Jimmy's ADHD under Listing112.11 and his bipolar disorder under Listing 112.04A2 and 3.  Tr. 15.

In evaluating Jimmy's ADHD, the ALJ found Jimmy did not have marked[2] inattention, impulsiveness and hyperactivity.  Listing 112.11 states:

> Listing 112.11 *Attention Deficit Hyperactivity Disorder*:  Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity.  The required level of severity for these disorders is met when the requirements in **both A and B** are satisfied.
> - A. Medically documented findings of **all three** of the following:
> - 1. Marked inattention; and
> - 2. Marked impulsiveness; and
> - 3. Marked hyperactivity;
>
> **AND**
> - B. For . . . children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph **B2 of 112.02**.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §112.11.  **B2 of 112.02** states in pertinent part:

> B2. For children (age 3 to attainment of age 18), resulting in **at least two of the following**:
>
> a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, . . . or
>
> b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other

---

[2] Where "marked" is used as a standard for measuring the degree of limitation it means more than moderate but less than extreme.  A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis.  *See* 20 C.F.R., Part 404, Subpart P, Appendix 1, Part B, Listing 112.00C (Assessment of Severity).  *See also*, 20 C.F.R. § 416.926a(e)(2)("We will find that you have a 'marked' limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities.  Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities.  'Marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.'").

        individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

   c.    Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

   d.    Marked difficulties in maintaining concentration, persistence, or pace.

*Id.*, §112.02 B2.   In her decision, the ALJ found:

> **Attention deficit hyperactivity disorder ("ADHD")**.  The claimant does not have an impairment that meets or equals the criteria of any of the listed impairments of Appendix 1. The listing section applicable to the claimant's ADHD is §112.11 regarding attention deficit hyperactivity disorder.  The requirements of this listing are satisfied only where there is evidence of marked inattention, impulsiveness and hyperactivity.  The medical evidence establishes the claimant does not have marked problems in these three areas when he takes his prescribed medication.  The claimant has received treatment in the form of medications for his bipolar disorder and ADHD from Barbara James Mora, M.D. (Exhibit 1F).  He has received counseling from Ken Hutchinson, Ph.D. beginning October 2002 (Exhibit 1F, at 3-4), as well as through Border Area Mental Health Services, Inc. since February 2003 with Dr. Barendson, Dr. Lenroot, and Silva Madrid (Exhibit 5F).  Most recently, his treating sources with BAMHS have determined the claimant's affective problems relative to depression and anxiety were most likely secondary to his ADHD (Exhibit 5F, at 16).  The records reflect that when Jimmy takes his medications, his school work and social ability improve (Exhibits 5F, at 2, 9, 12, and 37).  At the time of the hearing, the claimant's mental condition was controlled through a combination of medications including Strattera and Zyprexa (Exhibit 5F, at 2, 20E). The most recent statements from the claimant's teachers reflect the belief that he has made remarkable progress as far as his behavior, ability to read and to play a musical instrument (Exhibit 18E).  While Jimmy has some problems with attention, impulsivity and hyperactivity, these behaviors are far below marked.  Indeed, the claimant's band teacher, Chris Gearhart is of the opinion that the claimant's residual inappropriate behaviors are the result of his electing to make bad choices.  This teacher documents that she has observed Jimmy to make good decisions, and that in the months preceding April 2003 Jimmy had elected to make bad decisions regarding his behavior (Exhibit 18E, at 5).  The claimant's primary treating source for his mental impairments at BAMHS documents in the most recent treatment record dated April 6, 2004 that the claimant was pleasant and controlled during treatments sessions (Exhibit 5F, at 3).

Tr. 15.  Crespin contends the ALJ's finding that JRC did not have marked inattention, marked impulsiveness, and marked hyperactivity is "contrary to all of the reports from [JRC's] teachers, who are vastly more qualified to report [Jimmy's] daily behavior than are the medical providers." Mem. in Support of Mot. to Reverse at 19.  Crespin contends "[e]ach teacher that reported

serious problems in each of these areas noted that the behaviors exist in spite of Jimmy's compliance with medications." *Id.*  Additionally, Crespin contends the ALJ's finding is also "contrary to the medical evidence as well." *Id.*, n.11.  Crespin asserts Jimmy's treating doctor never mentions noncompliance with the prescribed medication and noted Jimmy experienced anxiety, perfectionism, tendency to become upset, pressured speech, tearfulness, and peer problems.  *Id.*

Crespin cites to pages **91, 159, 167**, and **175** of the transcript to support her position. **Page 91** is a part of a Teacher Questionnaire completed by Ms. Law, one of Jimmy's Special Education teachers, and dated December 5, 2003.  Tr. 85-92.  Ms. Law noted she had taught Jimmy for **seven years**, and spent "Every school day- 2 hours" with him.  Ms. Law was teaching Jimmy English I in 9th grade.  Tr. 85.  Ms. Law rated Jimmy in different domains with each domain listing thirteen areas of functioning compared to same-aged children without impairments.

In the **domain** of "Acquiring and Using Information," Ms. Law noted "Jimmy comprehends material at grade level but has a very difficult time with written expression."  Tr. 86. In comparison to "the functioning of same-aged children without impairments," Ms. Law rated Jimmy as having "**No problems**" in the areas of "Understanding and participating in class discussions" and "Providing organized oral explanations and adequate descriptions."  Tr. 86.  Ms. Law rated Jimmy as having "**An obvious problem**" in three areas of functioning in this domain: (1) Understanding school and content vocabulary; (2) Reading and comprehending written material; (3) and (4) Applying problem-solving skills in class discussions.  Ms. Law rated Jimmy as having "**A serious problem**" in only one area of functioning in this domain, "Expressing ideas in written form."  *Id.*   Mr. Law rated Jimmy as having "a slight problem" in four areas.  *Id.*

6

In the domain of "Attending and Completing Tasks**,**" Ms. Law rated Jimmy as having "**A serious problem**" in two areas, "Focusing long enough to finish assigned activity or task," and "Waiting to take turns."  Tr. 87.  Ms. Law rated Jimmy as having "**An obvious problem**" in seven areas of functioning in this domain: (1) Paying attention when spoken to directly; (2) Sustaining attention during play/sports activities; (3) Refocusing to task when necessary; (4) Carrying out multi-step instructions; (5) Changing from one activity to another without being disruptive; (6) Working without distracting self or others; and (7) Working at reasonable pace/finishing on time.  *Id.*  Ms. Law noted, "Jimmy is very organized but is also very easily distracted and impulsive."  *Id.*  Ms. Law rated Jimmy as having "**No problem**" in one area of functioning and "**A slight problem**" in three areas of functioning.

In the domain of "Interacting and Relating with Others," Ms. Law rated Jimmy as having "**A serious problem**" in the areas of "Making and keeping friends" and "Taking turns in a conversation."  Tr. 88.  Ms. Law rated Jimmy as having "**An obvious problem**" in the following two areas of functioning: (1) Playing cooperatively with other children; and (2) Interpreting meaning of facial expression, body language, hints, sarcasm."  *Id.*  Ms. Law rated four areas of functioning in this domain as "**No problem**"and five areas as "**A slight problem.**"  *Id.*  Ms. Law noted, "Jimmy needs to be allowed to have quiet time or to move around.  Sometimes he needs to leave the classroom for a period of time in order to refocus his energy."  *Id.*

Ms. Law found no problems in the domains of "Interacting and Relating with Others," and "Moving About and Manipulating Objects."  Tr. 89.  In the domain of "Caring for Himself," Ms. Law rated Jimmy as having "**No problem**" in two areas of functioning and "**A slight problem"** in two areas of functioning.  Tr. 90.  Ms. Law rated Jimmy as having "**A serious problem**" in <u>four</u>

7

areas of functioning: (1) Handling frustration appropriately; (2) Being patient when necessary; (3) Identifying and appropriately asserting emotional needs; and (4) Responding appropriately to changes in own mood (e.g., calming self). *Id.* Ms. Law rated Jimmy as having "**An obvious problem**" in two areas of functioning, "Using appropriate coping skills to meet daily demands of school environment" and "Knowing when to ask for help."

Under "Medical Conditions and Medications/Health and Physical Well-Being," Ms. Law noted Jimmy "took his medication on a regular basis" and "his functioning changed after taking medication." Tr. 91. Specifically, Ms. Law noted, "Without his current medication Jimmy is extremely unfocused and unable to be quiet or settle down to work. There is an obvious difference in Jimmy when he is on medication. When he takes it he is able to concentrate and is calm. Without it, he is unfocused and unable to sit still." *Id.* This statement, standing alone, would appear to support the ALJ's finding that "the medical evidence establishes the claimant does not have [marked inattention, marked impulsiveness or marked hyperactivity]" when he takes his prescribed medication." Tr. 15. However, Ms. Law rated Jimmy as having a "serious problem" in many areas of functioning in different domains when he was on medication. Under "Attending and Completing Tasks," Ms. Law also noted Jimmy was "very easily distracted and impulsive." Tr. 87.

**Page 159** of the transcript is part of a Teacher Questionnaire completed by Ms. Martinez on November 26, 2002. Tr. 153-160. Ms. Martinez, Jimmy's Social Studies/Reading teacher, also rated Jimmy as having "**A serious problem**" in four areas in the domain of "Attending and Completing Tasks." Tr. 155. Under this domain, Ms. Martinez noted: "Without medication he cannot function." *Id.* Therefore, even with medication, Ms. Martinez opined Jimmy had "A

8

serious problem" in the following areas: (1) Waiting to take turns; (2) Completing class/homework assignments; (3) Working without distracting self or others; and (4) Working at reasonable pace/finishing on time.  Ms. Martinez also rated Jimmy as having "A serious problem" in  the areas of (1) Handling frustration appropriately and (2) Responding appropriately to changes in own mood (e.g. calming self) in the domain of "Caring for Himself."

**Page 167** is part of a Teacher Questionnaire completed by Ms. Law on November 21, 2002.  Tr. 161-168.  In this 2002 Teacher Questionnaire, Ms. Law noted Jimmy "works independently, but at a level significantly below grade level."  Tr. 162.  Ms. Law rated Jimmy as having "**A very serious problem**" in the area of "Expressing ideas in written form" under the domain of "Acquiring and Using Information."  *Id.*  Ms. Law also rated Jimmy as having **" A very serious problem"** in the area of "Waiting to take turns" in the domain of "Attending and Completing Tasks" and **"A serious problem**" in the areas of  (1) Focusing long enough to finish assigned activity or task; (2) Carrying out multi-step instructions; (3) Working without distracting self or others.  Tr. 163.   Under this domain (Attending and Completing Tasks), Ms. Law noted: "Jimmy is very easily distracted and has a difficult time controlling his impulsivity and inability to sit still."  *Id.*  Under the domain of "Interacting and Relating with Others," Ms. Law rated Jimmy as having "**A serious problem**" in four areas: (1) Playing cooperatively with other children; (2) Making and keeping friends; (3) Expressing anger appropriately; and (4) Taking turns in a conversation.  Tr. 164.

Under the domain of "Caring for Himself,"  Ms. Law rated Jimmy as having "**A serious problem**" in the following areas: (1) Handling frustration appropriately; (2) Being patient when necessary; (3) Using good judgment regarding personal safety and dangerous circumstances; and

9

(4) Identifying and appropriately asserting emotional needs. Tr. 166. Under this domain, Ms. Law noted: "Although Jimmy has progressed in these areas, he has a tendency to get easily frustrated and over react to emotionally. Sometimes he is not cognizant of potentially dangerous situations." *Id.* Ms. Law also noted Jimmy "historically [has] been less frustrated & more focused after his medication." Tr. 167.

**Page 175** is part of a November 26, 2002 Teacher Questionnaire Ms. Muller, Jimmy's math teacher, completed. Tr. 169-176. Ms. Muller rated Jimmy as having **"A very serious problem"** in two areas in the domain of "Attending and Completing Tasks": (1) Refocusing to task when necessary; and (2) Working without distracting self or others. Tr. 171. Under this domain, Ms. Muller noted: "When he is without his medication, the problems are worse. He will not stay on task and will constantly talk and becomes a disruptive influence in class." *Id.*

Under the domain of "Interacting and Relating With Others," Ms. Muller rated Jimmy as having **"A serious problem"** in the areas of "Playing cooperatively with other children" and "Making and keeping friends." Tr. 172. Under the domain of "Caring for Himself," Ms. Muller rated Jimmy as having **"A serious problem"** in the following areas: (1) Handling frustration appropriately; (2) Being patient when necessary; and (3) Using appropriate coping skills to meet daily demand of school environment. Tr. 174.

Ms. Crum, another one of Jimmy's teachers also completed a Teacher Questionnaire on December 5, 2003. Tr. 77-84. Ms. Crum indicated she taught Jimmy "all year in 7th grade and every day in 9th grade Semester I." Tr. 77. Ms. Crum rated Jimmy as having "**A serious problem**" in the domain of "Attending and Completing Tasks" in the area of "Paying Attention when spoken to directly." Tr. 79. Under the domain of "Interacting and Relating With Others,"

Ms. Crum noted: "Jimmy tends to be oppositional defiant when it comes to reprimand him from authority. He has bad social skills in dealing with people. His disability causes him to talk out of turn." Tr. 80. Under the domain of "Moving About and Manipulating Objects," Ms. Muller noted: "For pace of physical activities or tasks– Jimmy seems to run on a fast pace always in a rush. He has a hard time sitting still/standing still without fidgeting." Tr. 81. Under the domain of "Caring for Himself," Ms. Miller also noted in pertinent part: "Jimmy has a difficult time with dealing with his frustrations. He tends to speak out harshly then wants a time-out away from the group. Patience isn't always easy for Jimmy." Tr. 82. Ms. Muller opined Jimmy's fidgeting "gets less severe" once the medication "kicks in." Tr. 83.

On April 14, 2003, Ms. Gerheart, the Director of Music at Snell Middle School and Assistant Director of Music at Cobre High School submitted a letter to the IEP (Individualized Educational Program) committee. Ms. Gerheart noted in pertinent part:

> Jimmy usually does not have any problems turning in his homework each week. He can also read music and play his instrument at an acceptable level. He does meet the reading and playing competencies for an 8th grade music student with 3 years of playing experience. I do not have any concerns about his musical ability or his ability to succeed in the high school band program based on his reading and playing levels.
>
> I am concerned, however, about his behavior. Over the past three years, we have had some ups and downs in his behavior and maturity. Each time he has had some difficulties, he has made forward progress. He did begin this year very well. He was focused, working hard, and contributing positively to the band. <u>Since the Christmas break, it has begun to gradually change and now he is frequently not about to contribute to the group in a positive manner. He is not currently making forward progress</u>.
>
> To begin with, Jimmy spends most of his time in class and on trips <u>actively trying to distract other students</u> from what they are supposed to be doing. He does this by either <u>talking to them nonstop, or messing around to get their attention</u>. Unfortunately, this has been interrupting not only his learning but the learning of the other students and the class as well. He is also <u>unwilling to work with other students</u>, and is unwilling to work out solutions to problems with other students when they arise. When problems do arise, <u>he is very argumentative with other students and adults</u> especially if he does not get what he wants. Sometimes when he does not get what he wants, <u>he will become totally uncooperative with the other students until they</u>

> relent or an adult intervenes. He also is sometimes uncooperative with adults when they are required to intervene. Jimmy also will not accept any responsibility for his actions or his behavior. He will give excuse after excuse but never take the steps to solve any problems. It is always someone else's responsibility or someone else's fault but never his. He also is very unwilling to control his behavior in situations around other students or in public. We have had several incidents this year in which he has been removed from his seat in band class, on the bus, or in concerts. In every instance, he was given multiple opportunities to make better choices and choose the appropriate behavior for each situation. He, however, has not chosen to do so.
>
> Jimmy has shown since Christmas break that he can make good choices and act appropriately. He has shown he can do this many times. Unfortunately, he is frequently not choosing to make good decisions and is not concerned about the consequences for his actions. I am very concerned about his lack of maturity, lack of thought, and lack of personal control. I find this gradual change very disturbing.

Tr. 200-201. Ms. Gerheart did not recommend Jimmy for the high school band program because of his behavior, opining Jimmy "would not have any chance of success in high school band and would not contribute to the success of the high school." Tr. 201. Ms. Gerheart would recommend Jimmy only "[i]f he chooses to change his behavior and address and solve some of the behavior problems by the end of the school year . . . ." *Id.*

On April 16, 2003, Ms. Martinez, Jimmy's Social Studies teacher, described Jimmy as "sneaky and deceiptful (sic)" and "He is using his exceptionality as a crutch." Tr. 202. Ms. Martinez opined, "I see Jimmy Crespin as been (sic) ready to get out of Special Ed." *Id.* Ms. Martinez further opined Jimmy used his IEP as a crutch for not finishing his assignments in class and could finish the work if "he would just not be visiting with his peers . . . ." *Id.* Ms. Martinez noted: "His attitude and behavior really need to change. He always has to have the last say SO! He likes to argue with the teacher or talk back and the same with his peers." Tr. 203.

The ALJ cited to Ms. Gerheart's April 14, 2003 letter in her decision (Tr. 15) to support her finding that, although Jimmy had "some problems with attention, impulsivity and

hyperactivity, these behaviors [were] far below marked." Tr. 15.  However, the ALJ failed to address Ms. Gerheart's concerns regarding Jimmy's behavior which Ms. Gerheart opined was so inappropriate and disruptive that she could not recommend Jimmy for high school band.  Ms. Gerheart also opined Jimmy's disruptive behavior was a result of Jimmy "frequently not choosing to make good decisions . . . ." Tr. 200.  The ALJ relied on Ms. Gerheart's opinion "that the claimant's residual inappropriate behaviors [were] the result of his electing to make bad choices." Tr. 15.  However, many of the behaviors reported by Ms. Gerheart and Jimmy's other teachers are behaviors which may be a result of his ADHD or his Mood Disorder (Bipolar Disorder) and not necessarily under his control.  Jimmy's psychologist or his psychiatrist are better qualified to offer an opinion as to whether these behaviors are under Jimmy's control or the consequence of his impairments.

Of concern to the Court is the ALJ's failure to mention in her decision the September 5, 2004 letter Clifton R. Jones, Ph.D., submitted.  Dr. Jones wrote:

> I have reviewed the Section 112 Listing of Impairments (Children) in relation to James Crespin.  Within my practice as a school psychologist James qualifies for services with special education exceptionalities of Emotionally Disturbed (ED), Other Health Impaired: Attention Deficit Hyperactivity Disorder (ADHD), and Learning Disabled (LD).  This student's primary exceptionality of ED implies an **acute and chronic impact on this ability to benefit from his educational experience**.  James is receiving primary psychiatric and psychological services through community mental health and private sources.  **These sources collaborate DSM IV diagnosis of Bipolar Disorder (296.63) and Attention Deficit Hyperactivity Disorder (314.01), which correspond to the Section 112 Listing of Impairments (Children)**:
>
> 112.04     Mood Disorder (Bipolar Disorder)
> 112.11     Attention Deficit Hyperactivity Disorder

Tr. 345 (emphasis added).  The ALJ cited to other reports submitted by Dr. Jones to the IEP committee.  For example, in her decision, the ALJ relied on Dr. Jones' April 16, 2003 report noting: "The most recent evaluation by the school district psychologist, C. R. Jones, Ph.D. reveals

13

his conclusion that Jimmy has experienced a leveling out of his emotional extremes in the past four years, in that he is less subject to mood swings that in the past had been triggered by relatively minor issues." Tr. 16, 20.  However, Dr. Jones' April 16, 2003 report also states: "Staff report that he continues to experience some interpersonal concerns and emotionality along with much perfectionism.  He sometimes remains stuck in a pattern or ritual and becomes over-focused on details."  Tr. 356.

Ken Hutchinson, Ph.D., also evaluated Jimmy.  On October 14, 2002, in a letter to Dr. Mora, Jimmy's primary care provider, Dr. Hutchinson wrote in pertinent part:

> <u>Jimmy still appears to exhibit many symptoms of ADHD even on the meds</u>.  He was scored at the 15th %ile on the Inattentive scale, the 1st %ile on the impulsive scale, and the 1st %ile on the Hyperactive scale.  He was scored overall at the 1st %ile.  <u>So even on his medications Jimmy's behavior is difficult</u>.  While Jimmy scored himself low on the Kovacs' Children's Depression Inventory (51st %ile), his mother sees moods as playing a much larger rule as scored on the Personality Inventory for Children (PIC).  On this test, Jimmy was scored as having very poor self control, being socially challenged, and having some cognitive struggles.  He appears to be adjusting poorly to his life, to be depressed and anxious, and to appear different enough from his peers that he stand out in a negative way.  <u>He is also likely to be "hyper" much of the time and lack social skills</u>.

Tr. 238 (emphasis added).  In her decision, the ALJ cited to Dr. Hutchinson's October 14, 2002 letter noting, in pertinent part: "Additional tests reflected the child continued to be highly inattentive, impulsive and anxious, and appeared different enough from his peers that he stood out in a negative way."  Tr. 19.  Nonetheless, the ALJ disregarded Dr. Hutchinson's opinion without explanation and afforded more weight to the opinion of Scott Walker, M.D., the State Agency nonexamining consultant.  *See* Tr. 20 ("In reaching this conclusion, I have afforded the most weight to the opinion of the State Agency physician, Scott Walker, M.D., who reviewed the evidence of record at the reconsideration level of review.  His opinion is consistent with the medical and other evidence of record."); Tr. 21 (same); Tr 22 (same).

14

However, "[t]he opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all." *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (emphasis added).  Additionally, when an ALJ decides to disregard a medical report by a claimant's physician, she must set forth "specific, legitimate reasons" for her decision. *Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996)(quoting *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987).  In this case, the ALJ afforded more weight to the opinion of the nonexamining agency consultant than she afforded to the opinions of Drs. Jones and Hutchinson.

After meticulously reviewing the record, the Court finds that the ALJ's finding that Jimmy's "problems with attention, impulsivity and hyperactivity" are "far below marked" is not supported by substantial evidence.  On remand, the ALJ shall consider the opinions of Drs. Jones and Hutchinson.  If the ALJ chooses to reject these opinions, she should set forth "specific, legitimate reasons" for doing so.  The Court also notes Dr. Jones mentioned in his September 5, 2004 letter that Jimmy received his primary psychiatric and psychological services through "community mental health and private sources" and that "[t]hese sources corroborated the diagnosis of [ADHD] and Bipolar Disorder which correspond to the Section 112 Listing of Impairments (Children)." Tr. 345.  It is not clear to the Court whether *these sources* opined that Jimmy meets Listings 112.04 and 112.11 or whether he has merely been diagnosed with these impairments.  This is an important distinction.  The Tenth Circuit has held that "disability determinations turn on the functional consequences, not the causes, of a claimant's condition, and '[t]he mere diagnosis of [ADHD and Bipolar Disorder], of course says nothing about the severity of the condition[s].'" *Scull v. Apfel*, No. 99-7106, 2000 WL 1028250, at **1 (10th Cir. July 26,

15

2000)(quoting *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)); *see also, Heinritz v. Barnhart*, No. 05-5208, 2006 WL 2294850, at *4 (10th Cir. Aug. 10, 2006)("An ALJ is required to consider the limitations that a given impairment has on the claimant's abilities to work rather than the label given to a disease or ailment."). On remand, the ALJ should contact Dr. Jones for clarification.

Finally, the ALJ should consider all the evidence and not just the portions of the record that favor denial of benefits. *See Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir.1984)(An ALJ may not simply pick out portions of a medical report that favor denial of benefits, while ignoring those favorable to disability.). Because the Court is remanding the case on the issue of whether the evidence supports a finding of marked inattention, impulsiveness and hyperactivity under Listing 112.11, it will not address Crespin's remaining arguments.

However, the Court expresses no opinion as to the extent of Jimmy's impairments, or whether he is or is not disabled within the meaning of the Social Security Act. The Court does not require any result. This remand simply assures that the ALJ applies the correct legal standards in reaching a decision based on the facts of the case.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**